# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRY SULLIVAN,** | : | **Civil No. 4:25-CV-423** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.    Introduction

This Social Security Appeal illustrates two recurring themes in disability litigation. First, it is an example of a fundamental proposition which is essential to informed decision-making in this field, the obligation of Administrative Law Judges (ALJs) to provide sufficient articulation of the rationale for their decisions. In addition, this case reveals how a failure of articulation by an ALJ is often subject to harmless error analysis.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

So it is here. On appeal, Terry Sullivan advances a single, specific claim, arguing that the ALJ's decision failed to meet this articulation test with respect to one medical opinion which described limitations on his ability to stand and walk. As discussed below, we agree that the analysis here was wanting but find that that this error was harmless on the unique facts of this case, where the undisputed evidence indicates that these standing and walking limitations would not have eroded Sullivan's ability to perform some work. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    <u>Statement of Facts and of the Case</u>

### A. <u>Sullivan's Clinical History and Activities of Daily Living.</u>

On April 21, 2022, Terry Sullivan filed applications for a period of disability and disability insurance benefits as well as supplemental security income pursuant to Titles II and XVI of the Social Security Act, alleging an onset of disability beginning March 1, 2020. (Tr. 17). According to Sullivan, a series of medical conditions, including peripheral neuropathy; degenerative joint disease of both knees; diabetes mellitus; Grave's disease; visual disturbances; asthma; and obesity left him unable to work. (Tr. 19). Sullivan was born was born on November 4, 1976, and was 43 years old, which is defined as a younger individual by the Commissioner's regulations at the time of this alleged onset of his disability. (Tr.

24). He had a high school education and had previously worked as a warehouse supervisor and retail salesperson. (Id.)

The sole issue in this appeal is the adequacy of the ALJ's analysis of the medical opinion evidence concerning Sullivan's ability to perform light work, and particularly any limitations on Sullivan's capability to sit, stand and walk during the workday. With respect to this issue, the clinical evidence was largely unremarkable and benign.

Between February of 2020 and November of 2023, Sullivan's primary care giver was the Geisinger Health System. Geisinger's treatment records for Sullivan provide no indication of severe limitations concerning his ability to ambulate. While these treatment notes consistently described Sullivan as an obese diabetic, (tr. 313, 323, 332, 346, 377, 423), and identified neuropathy as one of his medical complications, but noted that the neuropathy was successfully treated with gabapentin. (Tr. 347, 367, 422).

Beyond these findings, Sullivan was described as a healthy appearing male, who was experiencing no current issues with his feet. (Tr. 313, 317, 331). He displayed a normal range of motion. (Tr. 444, 771). Treatment notes repeatedly stated that Sullivan was healthy, alert, with no distress, cooperative and comfortable.

(Tr. 346, 358, 369, 382, 423). His gait and reflexes were routinely described as normal. (Tr, 347, 358, 370, 383, 424, 445, 717).

These treatment record findings were echoed by a consulting, examining source, CRNP Kelly Schultz, who performed an examination of Sullivan on September 21, 2022. (Tr. 602-12). In her report of examination, CRNP Schultz stated that Sullivan's knee and ankle pain were treated with gabapentin. (Tr. 603). According to CRNP Schultz, Sullivan reported that he was able to shop, drive, and frequently prepare meals. (Tr. 604). The examination of Sullivan disclosed that his gait was normal, he was able to walk heel to toes without difficulty, could perform a 60% squat, had a normal stance, and was able to rise from a chair without difficulty. (Id.) There was no evidence of joint deformity; Sullivan displayed 5/5 strength in his upper and lower extremities; his hand and finger dexterity was intact; he demonstrated full grip strength bilaterally; and there was no evidence of muscle atrophy. (Tr. 605).

Sullivan's self-reported activities of daily living also suggested the capacity to perform some work. Sullivan acknowledged that he could drive, shop, and prepare meals. (Tr. 38, 604). At his administrative hearing, Sullivan also described taking a two mile woodland hike, while stating that the hike was an arduous process. (Tr. 52).

B. **The Medical Opinion Evidence**

Given this fairly benign clinical history, three medical experts provided function by function assessments of Sullivan's residual functional capacity.[2] These experts included two non-examining state agency physicians, Dr. Ethel Hooper and Dr. Gene Whang, who reported on Sullivan's ability to perform work in October of 2022 and April of 2023. (Tr. 61-93). In addition, CRNP, Kelly Schultz, a consulting examining source, provided an assessment regarding Sullivan's level of functioning on September 21, 2022. (Tr. 602-12). All of these medical sources agreed that Sullivan could meet the lifting and carrying demands of light work. (Tr. 64, 72, 80-81, 607). There was some discrepancy between these medical sources, however, regarding Sullivan's ability to stand, sit and walk during the workday. For their part, Drs. Hooper and Whang both agreed that Sullivan could, sit, stand and walk for up to six hours during an eight hour workday. (Tr. 64, 72, 80-81). In contrast, CRNP reached a somewhat more restrictive opinion, stating that at any one time Sullivan could sit for eight hours, stand for one to two hours, and walk for thirty minutes. (Tr.

---

[2] A treating source, Carl Dassup PA-C, also provided an extreme outlier report in November of 2023. (Tr. 779-82). While that report opined that Sullivan was incapable of performing any work, it provided absolutely no assessment of Sullivan's ability to lift, carry, stand, walk, or sit. (Id.) The ALJ found this cursory report unpersuasive, (Tr. 23), and Sullivan does not challenge this determination on appeal.

608). Over the course of an eight hour workday, CRNP Schultz opined that Sullivan could sit for eight hours, stand for four to six hours, and walk for three to four hours. (Id.)

It was against this medical background that Sullivan's case came to be considered by the ALJ.

### C. **The ALJ Hearing and Decision.**

A hearing was conducted in this case on November 27, 2023, at which Sullivan and a vocational expert testified. (Tr. 31-59). In his testimony, Sullivan volunteered that he had taken a two mile hike, albeit with great difficulty. (Tr. 52). Further, Sullivan reported the need to frequently change his position due to pain, stating that he needed to shift from sitting to standing very fifteen minutes. (Tr. 49). These extreme self-reported limitations far exceeded the restrictions found by any medical source and were unsupported by any contemporaneous treatment notes. In the course of the hearing, the Vocational Expert was specifically questioned regarding whether these standing and sitting limitations would affect Sullivan's ability to work and stated that they would not, testifying that if "he's just changing positions, it would be ok." (Tr. 57). Thus, the uncontested testimony of the Vocational Expert indicated that any differences of medical opinion regarding

6

Sullivan's ability to sit and stand during the workday were immaterial since they would not affect his ability to perform the jobs identified by the expert.

Following this hearing, on April 16, 2024, the ALJ issued a decision in Sullivan's case. (Tr. 14-25). In that decision, the ALJ first concluded that Sullivan met the insured requirements through March 31, 2026, and had not engaged in substantial gainful activity since the alleged onset date of March 1, 2020. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Sullivan had the following severe impairments: peripheral neuropathy; degenerative joint disease of both knees; diabetes mellitus; Grave's disease; visual disturbances; asthma; and obesity. (Id.)

At Step 3, the ALJ determined that Sullivan did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 20). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Sullivan's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch or crawl. The claimant can never be exposed to unprotected heights, and he can never operate hazardous machinery. He is able to

avoid ordinary hazards in the workplace, such as boxes on the floor, doors being ajar, or approaching people or vehicles. He can tolerate frequent exposure to atmospheric conditions, extreme cold, extreme heat and vibrations.

(Tr. 20-21).

Notably, the RFC fashioned by the ALJ did not incorporate the sit/stand limitations suggested by CRNP Schultz but seemingly adopted the less restrictive views voiced by Drs. Hooper and Whang. In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Sullivan's self-described limitations. (Tr. 21-23). However, the ALJ's assessment of CRNP Schultz's medical opinion was somewhat enigmatic. With respect to this medical opinion, the ALJ simply stated that:

> The undersigned considered the opinion from Kelly Shultz, CRNP, who found the claimant limited to light exertion with standing for 2 hours, walking for 4 hours, with postural and environmental limitations (4F). This opinion is partially persuasive, as it is somewhat consistent with and supported by x-rays of the knees which showed mild osteoarthritis in the left and right knees (4F/5). This opinion is also somewhat supported by neuropathy treated with gabapentin (2F/43). The claimant reported noted improvement with foot pain since starting medication (2F/99).

(Tr. 23).

This medical opinion assessment was particularly ambiguous since it described CRNP Schultz's opinion as partially persuasive but provided absolutely

no insight or explanation regarding which portions of the opinion were persuasive and which aspects of the opinion lacked persuasive power.

Having made these findings, the ALJ relied upon the Vocational Expert's testimony to conclude that Sullivan could perform some of his past relevant work and that there were other jobs that existed in significant numbers in the national economy that Sullivan could perform. (Tr. 23-25). Accordingly, the ALJ concluded that Sullivan had not met the stringent standard of disability set by law and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Sullivan advances a single, narrow claim arguing that the ALJ's discussion of CRNP Schultz's opinion failed to meet the articulation standards prescribed by law since it failed to identify which aspects of that opinion were unpersuasive. We agree that this analysis was deficient, but as discussed below, find that this error was harmless given the uncontested Vocational Expert testimony which stated that these standing and sitting limitations would not affect Sullivan's ability to work. (Tr. 57). Accordingly, we will affirm the decision of the Commissioner.

## III.    <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. <u>See</u> 42 U.S.C. § 405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

11

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id.</u> at 120; <u>see</u> Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B. <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

17

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

This duty of articulation specifically applies to the ALJ's analysis of the medical opinion evidence. The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis.

However, these governing regulations emphasize that the ALJ  must adequately articulate the factual basis for a medical opinion persuasiveness evaluation.  As one court as aptly observed:

18

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

*Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions."* Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

*An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2).* With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020) (emphasis added).

### C. **The ALJ's Evaluation of CRNP Schultz's Medical Opinion Was Insufficient but That Error Was Harmless Given the Uncontested Evidence that the Sit/Stand Limitations Opined by CRNP Schultz Would Not Affect Sullivan's Ability to Perform Work.**

On appeal, Terry Sullivan advances a single, specific claim, arguing that the ALJ's decision failed to meet the articulation test prescribed by law with respect to CRNP Schultz's medical opinion which described limitations on his ability to stand and walk. We agree that the analysis here was wanting. In our view, under the Commissioner's current medical opinion regulations the ALJ must address the persuasiveness of each medical opinion and must explain the consistency and supportability of each opinion. This principle applies with particular force when, as in this case, the ALJ announces that a medical opinion is only partially persuasive. In this setting, this duty of articulation requires, at a minimum, that the ALJ identify which portions of the opinion are persuasive, which portions lack persuasive power, and provide some explanation of these conclusions rooted in the evidence. That did not happen here.

Judged by these basic standards, the ALJ's assessment of CRNP Schultz's

opinion—which failed to identify which aspects of this "partially persuasive" opinion were persuasive—is deficient when viewed in the abstract. However, we are enjoined to refrain from viewing these deficiencies in the abstract. Rather any errors in ALJ analysis must be considered in the factual context of the case and are subject to harmless error analysis. Thus:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: " 'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.' " Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

> Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

> In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> > In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir.

2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.' " <u>Hyer v. Colvin</u>, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

<u>Harrison v. Berryhill</u>, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

<u>Drozd v. Kizakaji</u>, No. 1:21-CV-2063, 2023 WL 122387, at *11 (M.D. Pa. Jan. 6, 2023).

In this case, while we find that Sullivan has identified an ALJ error in failing to more clearly articulate which portions of CRNP Schultz's medical opinion were unpersuasive, he has not shown that this error prejudiced his substantial rights by affecting the outcome of the proceeding, or undermining the perceived fairness, integrity, or public reputation of the proceedings. On this score, Sullivan's argument runs afoul of an insurmountable obstacle: the undisputed Vocational Expert testimony indicates that these alleged limitations on Sullivan's ability to sit or stand for prolonged periods of time would not have eroded his ability to perform the tasks identified by that expert witness. Therefore, any errors stemming from the incomplete articulation of the rationale for deeming one medical expert's opinion partially persuasive are harmless where the ambiguity in the analysis of this opinion

would not have affected the final conclusion that  Sullivan could perform tasks that existed in the national economy.

In closing, recognizing that the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination, and confronted with uncontested expert testimony which undermines any claim that CRNP Schultz's sit/stand limitations would have changed the ultimate outcome in this case, we find the ALJ's error in failing to address that opinion in a more fulsome way was harmless on the unique facts of this case. Therefore, we are constrained to affirm that decision.

## IV.  __Conclusion__

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: December 17, 2025